if I pronounce that correctly. Mr. Abrams. Good morning, Your Honor. I'm Floyd Abrams, representing Tom Hoy and USI. This is an appeal with respect to two issues fully briefed before you. One is a pure issue of law as to whether prejudgment interest may be awarded in copyright cases and in particular copyright cases with respect to infringer profits. The other issue which I'd like to spend more of my time on, let me ask first if I may reserve four minutes for my rebuttal, Your Honor. Yes, sir, that's fine. Relates to the excessiveness issue which we have raised in which the Third Circuit remanded for a further hearing on. I want to focus on only one aspect. So you're not going to start with the threshold issue of whether or not prejudgment interest ought to be available in copyright cases. I'm quite ready to, Your Honor, and perhaps I should. It's point one in our brief. No, it is a threshold issue and I'm certainly not trying to suggest you should allocate your time anyway other than what you want, but perhaps you could then indicate why we should not simply apply the general rule that because we're dealing with a Your Honor, I would urge on you that the general rule when Congress does not say whether there's interest or not is one which does send you or ought to send you to the statute itself, the nature of the statute, other provisions in the statute, the ordinary legislative history sort of I think it should carry weight in this case because Congress laid out here a system of providing compensation to entities whose works have been infringed, and they provided two basic mechanisms for getting paid. One is actual damages, which are not sought here. There were no out-of-pocket damages, and the other is the profits that my clients made. When you turn to the profits made, the way at least a number of courts have approached it is to ask the question, what is the policy being served by allowing prejudgment interest of monies that were never held by the plaintiffs in the first place? They were never lost. Well, isn't one interest that is served is to make a determination as a matter of legal policy as between a wrongdoer and a wronged party as to who should have the time value of the money that is at the heart of the compensatory? That is certainly true with respect to money of the plaintiffs. There's no doubt that where the plaintiffs sustains actual damages, lost some sales. Why should it be limited to actual damages? There is no question here as a result of this verdict that someone has profited as a result of some infringing behavior, right? That's the result of the verdict. Yes, sir. And the allocation that's reached here, I guess it was 70 and 75 percent, makes the determination as to how much of those profits should be allocated to the infringement. So the result might be said to be a windfall, even if we assume it's a windfall, isn't the question who ought to benefit, the wrongdoer or the party who has been wronged? We can't dispute the fact that money has time value, right? No, I don't, Your Honor. And that argument, which is obviously a serious one, is one which is present in every situation in which one is deciding whether or not to award prejudgment interest. When Congress addressed the issue of interest in the patent area, it said that interest should be awarded. It said that in so many words. Wasn't Congress in that case simply codifying what was existing practice at the time? In other words, the judges were basically awarding prejudgment interest in patent cases. I think Congress was deciding, Your Honor, as between some alternative views on the subject. And indeed, as the Sixth Circuit opinion in this area suggests, albeit briefly, but suggests directly on point, that the notion that Congress says in one case we're awarding prejudgment interest and doesn't say in another statute written later anything about prejudgment interest in a circumstance. You're referring to the amendment to the copyright? Yes, Your Honor. But that was really decades later. I mean, that was a whole different Congress 30 years later. I don't know that we can make much of allowing judgment interest in patent cases and not deciding to include them in the copyright instance. Well, the courts sometimes have looked to the Patent Act and the Sheldon MGM case, for example. But wasn't the congressional action with respect to the non-availability of prejudgment interest in the patent area and Congress' determination to make it available a reaction to some decisions, some holdings that was not available? And therefore, Congress saw a need to correct that? Yes, Your Honor. There were contrasting rulings at the time, and Congress chose in the patent area to award prejudgment interest. So has Congress been confronted with a similar weight of authority in the copyright area that ought to have actuated them to speak statutorily on the issue? The question of what state of mind to attribute to Congress, I appreciate, is always a fancy one. We grapple with that frequently. I know, but Congress had before it the mechanism chosen by an earlier Congress, different people on a closely related subject, and the courts, the Supreme Court in the MGM case, for example, has indeed with respect to apportionment. In that case, they said, you know, under the apportionment is already allowed in patent cases. Why shouldn't we allow it in copyright cases? I mean, the areas of law are similar, and that's why the Sixth Circuit, at least, relied upon the patent rulings in this copyright case. I know you had another priority for your argument, and I didn't want to sidetrack you, Mr. Abrams, but I frankly in research was rather surprised that there is as little as there is in the way of authority in this area. We've not spoken precedentially to it in the past, and so I thought... No, it is sort of unusual, Your Honor, to have a situation where you've got five courts of appeals that have ruled, and most of them in a paragraph or less, and three courts of appeals saying there is a division in the circuits, and not weighing in one way or the other, so you'll have your turn. The strength of your argument, then, is that because Congress specifically provided for failed to do so when it amended the copyright statute, that signals that prejudgment interest should be in the statute in order for the district court to allow it. That at least you ought not to assume that it should not be in the statute. Can we make sense of the Supreme Court's statement in the Rogers case, you might be familiar with it, where the Supreme Court said that the failure to mention prejudgment interest in statutes which create obligations has not been interpreted by it as manifesting an unequivocal congressional purpose that the obligation shall not bear interest. In other words, just because it's not there doesn't mean that Congress did not intend for it. Your Honor, we agree that the simple omission, when you are addressing this question for the first time, the simple omission of Congress speaking does not in and of itself decide the One argument I've made to you with no great success so far is that where Congress has addressed a related area, that should have some impact on you. The other thing I'd say, and the only other thing I'd really say on this issue, is that the Rogers case itself is really the foundation of wisdom here. Because the Rogers case goes beyond that to say, and I think very clearly to say, when we decide when to award prejudgment interest, what do we look at? We look at whether the plaintiff is getting actual damages to which we might add prejudgment interest, and we look at the size of the verdict, or maybe in general, sizes of verdicts. Ours is not an actual damage case. The Rogers case was, and it's not just that it was, it's that Rogers said that the purpose of prejudgment interest is to redress the plaintiff who had damages, who lost something. Is the imposition a matter of discretion with the district judge? I think not, Your Honor. And our argument to you is that this is not a balance of equities. This is a situation, one way or the other, that you should decide whether, as the other courts of appeals, however briefly, have decided, whether or not prejudgment interest ought to be allowed. You wouldn't dispute, would you, that the Copyright Act seeks to deter infringement and compensate copyright holders? You wouldn't dispute that? I would not dispute that, Your Honor. You've willfully infringed Graham's copyright since, what, 1992? That's what was found, Your Honor. All right. Well, then, wouldn't it make sense, looking at this, to say that prejudgment interest necessarily should be there to compensate Graham? Doesn't that really form part of the compensation here? Well, our position to you, Your Honor, is that in a situation where Graham has lost nothing, where there are no actual damages, that that makes a difference. That had this been a case in which Graham could prove to the jury that any amount had been lost by him, that that would be a laydown. Yes, prejudgment interest should be available then, and it is available in that situation. The question before you is whether it makes any difference that this is not such a situation. Your red light is on, Mr. Abrams. I'm sorry? Your red light is on. Maybe you can save some time and talk about the other issue that you wanted to discuss. Yes, I'll deal with the other interest. I don't matter about all that. Thank you, Your Honor. Thank you. Mr. Wolfson? Good morning. Good morning, Your Honors. David Wolfson for Appellee William A. Graham Company. I will address some of the points that Mr. Abrams made first. I particularly would like to hear what you say to the argument that you're getting compensated for money that you never had, sir. Two answers to that, Judge Van Antwerpen. First of all, there are many cases that talk about the infringer profits remedy. In Section 504B of the Copyright Act, the 1976 Act, as well as the 1909 Act, as compensation. Indeed, one need look no further than the legislative history for the 76 Act, which talks about damages for compensation, profits being awarded to prevent the infringer from unfairly benefiting from a wrongful act, and then goes on to say where the defendant's are not more than a measure of the damages suffered by the copyright owner. You shouldn't be able to get both. Two questions. Yes. Isn't this measure of damages, isn't this remedy really more in the nature of disgorgement? Isn't it really more in the nature of an equitable remedy designed to prevent unjust enrichment? Such that my second question is, does it really matter what we call it? Does it really matter whether we call it compensatory or whether we call it something in the nature of an equitable remedy, unjust enrichment, disgorgement of profits, whatever? The answer, I think, is yes to both questions. Well, the first question, I would say it's both. The second question, Your Honor, I would say it does not matter. It's interesting, and for preparing for this argument today, I did spend a lot of time looking at the historical origins of the infringer of profits remedy. And I would commend to Your Honors Dobbs's Handbook on the Law of Remedies, which came out in 73 before the 76 Act. It's often cited by the Supreme Court, cited in the city of Milwaukee case, for example, a lot of these prejudgment interest cases. And if you- I used it in law school and nobody cites anything any more than I have in law school. I don't think I did use it in law school, which might explain some of the gaps in my record. If you agree that it is unjust enrichment, what you want to do is you want to make sure that USI doesn't keep the money because it would be unjust for them to keep those profits. Why would you impose a prejudgment interest if it's an equitable remedy and all you want to do is be sure that USI doesn't keep the money? And I think that goes back to Judge Meenan-Twerp's question about why you should have prejudgment interest in this case. For two reasons. First of all, it is compensation. It's referred to in the Sheldon case as compensation. Compensation and unjust enrichment. And particularly in this case, where it's the only money, the only remedy that the Graham Company asserted. So literally, as the legislative history of the 76 Act, this is a situation where the damages are the only damages that the Graham Company is receiving is with that one remedy of infringer profits. But the reason that my answer to Judge Smith's question was yes, his second question is, of course, historically, this remedy was available in copyright cases and patent cases in the 19th century. And it grew out of English common law, whereby the wrongdoer was made the trustee. I'm going to test the boundaries of my Latin pronunciation. The trustee ex maleficio. And this is discussed in cases from the 1920s and even earlier. Those that are not in the brief, so I'm going to cite them to your honors. Larson versus Wrigley, Justice Holmes talks, 1928, 277 U.S., 97. The infringer is the trustee ex maleficio. I must turn over all the proceeds of his wrong. Packett versus Sickles, 86 U.S., 611 from 1874. And it's talked about a lot in the Sheldon case, which Mr. Abrams mentioned. So to answer your question, all the, I'm sorry, go ahead. I'd like to move to that question and hopefully the next one. So to answer your question, Your Honor, why should it be awarded? First of all, historically, the courts were sitting in equity. This was an accounting of profits. They were sitting in equity. They had that power. And in the Dobbs treatise, he talks about how when you were talking about a trustee ex maleficio, prejudgment interest would typically be awarded. The reason I got the 1973 version of the book is to see what the background of the law was at the time that Congress was deliberating in the 76 Act. So that was the background of the law. You have the Supreme Court cases such as Rogers saying it should be up to the court to decide. District courts should apply equitable power. Is it a matter of discretion with the trial court? Well, it should be. Do you disagree with Mr. Abrams on that point? Well, of course, it always has been. You have the Rogers case saying that. You have the city of Milwaukee case saying that. You have untold number, the Pignataro case in the FLSA standard from the Third Circuit. The Risa case, Judge Smith in the Tomasco case. Securities fraud context, these are all Third Circuit case. SEC versus Antar. You don't think that, you're mentioning quite a few cases, but I wanted to get to this one other point. You don't think it's a bit of a windfall when your verdict is already essentially off the charts in comparison to other cases? Well, certainly. And you get damages for actual damages, and then you get profits. And then on top of that, you want prejudgment interest. It's not a bit of a windfall, too much of a windfall? Absolutely not a windfall. You didn't seek actual damages, did you? Correct, Your Honor. So there's no actual damages here. There's only the lost profits. And then it was certainly not a windfall. I mean, as Judge Van Antwerpen suggested with his question, yes, it's been 20 years. And to this day, my client has not received a penny. And even though we've won it every step of the way, so 20 years since the infringement and six years since the complaint was filed. Maybe we could talk a little bit about the basis for the huge, I say it's huge because in comparison to other cases like this, it's really very substantial. There was recently a verdict in- So much as one little paragraph that was copied from the standard works amounted to a full disgorgement of profits. I mean, it seems inequitable in some circumstances. The books that were copied were together about 500 pages long. They were copied in- But how much was used? All of it. Actually used in the process of meeting with customers, dealing with customers, pitching customers, explaining to customers the various types and forms of insurance coverage available. All of the books were used. No, you said, Mr. Abrams, you'd say 10%. Your president said about 10% per case. Or are you talking about all of it used by USI throughout its use or infringing of your works? The amount of- Okay, so we're talking about two different things. The books were copied onto their computer system, where for about 13 years, they were used thousands and thousands of times. And even though there were many changes in terms of the roll-up, the company had different ownership, different sales manager. Can I put the question a different way? How much for each of the proposals that USI contracted, how much of those contracts contained was from the standard works? It varied. So it could be as much as 30 or 40%. But the important thing is, and what the testimony and what the evidence showed, which is why the jury's decision was certainly supported by more than substantial evidence, and Judge Bartle was correct in applying his discretion in denying the motion for a new trial, the importance of the language that was taken was qualitatively more important than just its quantity. And that is because, and this is why when USI makes this argument, it's somewhat misleading. A lot of the material in the proposal was, to use the words of Professor Nimmer, boilerplate. It was not the Graham Company's language. It was things like lists of workers' comp, ratings, loss history, lists of automobiles. So that was not the kind of thing that if you were sitting there and you're going over this page by page, the customer's going to focus on. What the customer would be focusing on is, OK, am I going to change my broker? What does this guy really know about the insurance business? And that was the material, the only source. And this was cited in Graham 1, the two-year-ago decision from the Third Circuit, talks about they didn't have anything like these books. So the only thing that they could put in these proposals, and the only thing that they did put in these proposals that showed that they knew what they were talking about, that they could give good advice. I mean, kind of like being a lawyer and showing that you understand the law, you're going to be a trusted advisor, you're going to be able to guide your client. It was the material that they got from the Graham Company. They had those other- Well, what does the record show with respect to the frequency of use by defendant of this matter? 850- Excuse me. Sorry. Thank you. 857 proposals, over 300 customers used between 1992 and 2005. They continued to do it for months after the complaint was filed. And of course, they tried to hide it. So we'll never know how, what it was. They destroyed documents in violation- Well, I was going to ask that, and I'd like to hear Mr. Abrams perhaps speak to this point as well. That jury had a spoliation instruction provided. Yes, Your Honor. They had evidence of spoliation. Which was not appealed. That's the kind of thing that tends to get a jury upset under the right circumstances. Well, it should get anybody upset, Your Honor. I mean, not only did they, Judge Newcomer issued an order on August 15th of 2005 saying, turn over all of this material. And the vice president of the company, two months after that, goes to one of their repositories and takes 20 bins, 20 of those, I don't know if Your Honor has seen them, they're about this big and this wide, and takes all the stuff that's subject to the court order and shreds it. And then I take her deposition a month after that, and she, there's no way to put it. She commits perjury, and she says, no, no documents have been destroyed. This is the woman who supervised that. If you take the spoliation charge out of this equation, do you think that the jury's verdict of 70% of all profit is justified? Absolutely, Your Honor. The defendants, remember, had the burden in this part of the case. We had the burden in Graham 1. Now they had their burden. It was their burden to convince the jury that more than 70% should be deducted. I mean, it's justified because of what they didn't do in front of the jury? Well, as Graham 1 recited, we had a lot of evidence, and all that evidence that came in on the causal nexus decision in Graham 1 was, as Graham 1 says, it was relevant to the importance of the works in generating revenue. And so all of that evidence is also obviously considered for the jury both on that side and the defense side. So that's important here. And that's what you have to show in your initial burden. Yes. That is some kind of causal nexus, which obviously the jury found you had established. The burden then shifts to the defendant to demonstrate the extent to which the infringing matter did not contribute to this. Right. So it's a mirror image, and the Data General case refers to it as a mirror image. Am I correct that Dr. Gehring was basically unopposed? They didn't have their own expert. They didn't really oppose him, did they? They did not, and they adopted his numbers. I mean, they had a paralegal from Pepper Hamilton who said, I agree with all of these numbers. So he went in front of the jury. They didn't call any customers. I mean, now, of course, they're saying, oh, this couldn't have made any difference. They didn't call any customers to say, hey, yeah, we don't look at this stuff. And in fact, their own witnesses, some of whom I called in our case in chief, some of whom I brought out the testimony on cross-examination in their case of chief, their own witnesses admitted that looking at the proposals could convince somebody to change brokers. Mr. Wolfson, I think Mr. Abrams in rebuttal is going to speak to an issue that you may want to address in the remaining minutes, and I think that it goes, it's relative to the excessiveness issue, and I think it may go to just at what point in time from the date of infringement or from the date of discovery that we ought to be, or a court ought to be, calculating prejudgment interest, if available. Sorry, Your Honor. And that's the Ambromavage case, of course. And so if you get back to what's the... That's a substantial amount of what's at stake here, or matters greatly, right? Sure, absolutely. And if you get back to, well, what is the purpose of prejudgment interest, and what is the origin of this remedy, right? So this remedy where the infringer is made a trustee ex maleficio, as Dobbs puts it and as Justice Holmes puts it, and then you say, and the wrongdoer should turn over all, not some, all of the benefits, all of that unjust enrichment, all of the profits, right? So you say, well, on using that logic, does it make sense to start the clock running at some later point, or should we start the clock at the moment when they started earning the profits? So I would say... But doesn't it really come down to the difference between when a cause of action actually accrues, or application of the discovery rule, which is really a plaintiff-friendly rule, which is about tolling? Right. It does. For statute of limitations. Exactly. For limitations. Of course, the Ambromavage case, it says nothing about that, because as in probably 90 or maybe 99% of the cases, accrual and injury or harm always starts at the same time, right? So here you have an unusual situation where they hid the infringement, they destroyed documents to try to make, to impede finding it, Mr. Hoy violated agreements to not infringe, that was found by, that was the jury as well as listed in Graham 1 as something that happened, so you have them trying to hide the evidence, they keep everything confidential, and then now you say we should create a rule whereby they should be rewarded, and the clock shouldn't start running until 2002. I don't think that makes any sense. There was a specific question to the jury about when the infringing could have occurred, and was there not? It wasn't quite that. When you could have discovered the infringement. Yes, that's what you're talking about, yes, absolutely, there was a special interrogatory, that was the subject of Graham 1, of course. And that was 1991? No, the question was... 2004? Yes, the question was, should Graham have discovered the infringement through exercise of reasonable diligence earlier than it did, and in fact it was discovered in October or February of 2005. That's the earliest that you could have discovered it. And the jury said, no, they shouldn't have discovered it any earlier. But the evidence is that it began occurring in 1992? It began in 1992, July of 1992. But the point of one of my earlier questions, and what I'd like to hear Mr. Abrams address, is discovery really has nothing to do with the actual accrual of a cause of action, does it? The elements have already been established at some point in time objectively, it's just that the plaintiff doesn't know about it, doesn't know about his injury. That's correct, Your Honor. I mean, so the word accrual, as Your Honor is using it, those two are separate points. I suggest that some of the cases maybe have made a bit of a hash between accrual and discovery. They do, and that's often because they're not faced with the issue that's before the Court today. So they're being sloppy. Mr. Wolfson, thank you very much. Thank you very much, Your Honor. Mr. Abrams? First, I just want to give the Court the citation to the page of the record on which Mr. Graham said that he was talking about 10 to 15 percent of pages in a proposal, Your Honor's question earlier, and that's at A486 in which he said that. That is not disputed. It's not disputed that, as this Court said in Graham 1, that we're talking about only a few pages out of total proposals. That was the phrase of the Court in Graham 1, and it really can't be disputed what the nature of the language was at issue. It's one thing to say that insurance language is copyrightable or descriptions of insurance meet the very limited amount of creativity that is required to be copyrightable. It's another thing to say that that shouldn't be considered in determining what the Supreme Court in the MGM case reports to as a fair apportionment. And what we have here, I want to give the Court just one citation to the record. Plaintiffs' Exhibit 103A, prepared by Dr. Goering, who, as the Court asked and as Mr. Wilson correctly answered, was the only expert to testify. Exhibit 103A lists the material that was infringed by the amount of times it was infringed. I want to read the two sentences to the Court of the language which was infringed the second most, 507 infringements out of the 860-odd involved here, 560 of them included this language. It said, U.S.I. can provide pre-printed claim forms for your ease in submitting automobile general liability, workman's compensation, and property claims. Benefit, pre-printed claim forms minimize the time your staff spends on typing and paperwork and also ensures that all basic policy information and location coding is correct. Mr. Abrams, however minimal that may seem, I can't help thinking about the point that Judge Smith brought up a moment ago about the spoliation and the really massive destruction of discovery that could have led to other claims and other profits that could have been considered. I can't help thinking of a jury considering the wrongfulness of that conduct in its overall verdict. A jury could indeed have been affected by that. The only evidence though was that to the extent anything was destroyed, we're talking about a one-year period, one-year period when this company first owned the Allentown facility in 1995. There was no evidence at all and there was a negation of the evidence, of any evidence to that effect. Well, obviously the inference is that you had something to hide. The inference that the jury made from the destruction of discovery is that you had something to hide. And that it was valuable or you wouldn't have destroyed it. My point, Your Honor, is that we deal here with a case, we're dealing with a case about proposals. You have the proposals. They start at Exhibit 300. They're all here. They range from the early 1990s into early 2000. And my point is only that take the worst case in terms of spoilation, I'm not dealing with what inflames the jury, I'm just saying the worst case factually is that the proposals after 1995, the vast amount of the damages here has nothing to do with anything which could be impacted by spoilation. I mean, I'm perfectly prepared to assume that the client did the things which led to infringement. They copied it. They put it in. They were, they shouldn't have done it. Counsel, these arguments may have, probably should have been made to the jury if they weren't, but is there really something here to shock the judicial conscience? I think when you address the question, the court when it was here last time on the apportionment issue, phrased it in terms of whether it's against the weight of the evidence, whether you phrase it that way or shock the judicial conscience, yes, Your Honor, it's our view that a 70-75% apportionment of the totality of the profits over the entirety of this period came from those few words on those few pages of this nature as compared to every other case before you. You don't have another case before you with more than a 30% allocation in an indirect profits case like this other than the one that Professor Patry said was the most unusual one in American history. So yes, we think that there's ample material here for you to find that that sort of award is simply excessive. Mr. Abrams, thank you. Thank you very much. Thank you. Thank you. Thank you. And Mr. Wilson, for your excellent arguments, we'll take the case under advisement.